Mike O'Connor, Plaintiff-Appellant,†

v.

Buffalo County Board of Adjustment,
Defendant-Respondent,

Glacier Sands, LLC,
Intervening Defendant-Respondent.

School District of Cochrane-Fountain City,
Plaintiff,

v.

Buffalo County Board of Adjustment,
Defendant-Respondent,

Glacier Sands, LLC,
Intervening Defendant-Respondent.

Court of Appeals

*No. 2013AP2097. Submitted on briefs March 18, 2014.*
*—Decided April 22, 2014.*

2014 WI App 60

(Also reported in 847 N.W.2d 881.)

† Petition for Review denied August 4, 2014.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *John C. Ekman* and *Karla M. Vehrs* of *Lindquist & Vennum LLP*, Minneapolis, Minnesota.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Ronald Stadler* of *Gonzalez Saggio & Harlan, LLP*, Milwaukee.

On behalf of the intervening defendant-respondent, the cause was submitted on the brief of *Michael P. Screnock* and *Joseph D. Brydges* of *Michael Best & Friedrich LLP*, Madison.

Before Hoover, P.J., Mangerson and Stark, JJ.

¶ 1. STARK, J. Mike O'Connor appeals an order affirming the Buffalo County Board of Adjustment's decision to grant R&J Rolling Acres, LLP, (R&J) a

conditional use permit (CUP) to operate a "frac sand" mine. O'Connor argues the Board proceeded on an incorrect theory of law and acted "arbitrarily, unreasonably, and outside its jurisdiction[.]" We reject O'Connor's arguments and affirm.

## BACKGROUND

¶ 2. On January 13, 2012, R&J applied to Buffalo County for a CUP. R&J sought permission to establish a "[f]rac sand mining operation" on property that was zoned agricultural.[1] The application identified R&J as the "owner" of the property and Glacier Sands, LLC, as the "developer." Attached to the application were a property description, an aerial view of the property, a plat map, a satellite map identifying the proposed mine site, and a wetlands map. The application also included a map showing the proposed route trucks would use to travel to and from the property. Specifically, R&J asserted the "haul route" would be "south on [State Highway] 88 to [State Highway] 35." R&J estimated eighty trucks would leave the property via this route every weekday.

¶ 3. The Buffalo County Board of Adjustment held a public hearing on R&J's CUP application on February 2, 2012. During the hearing, the Board received public comments, visited the site, and ultimately

---

[1] "Frac sand" is

a high-purity quartz sand with very durable and very round grains. It is a crush-resistant material produced for use by the petroleum industry. It is used in the hydraulic fracturing process (known as "fracking") to produce petroleum fluids, such as oil, natural gas and natural gas liquids from rock units that lack adequate pore space for these fluids to flow to a well.

What is Frac Sand?, http://geology.com/articles/frac-sand/ (last visited Apr. 15, 2014).

voted to table R&J's application until the Board's next meeting on March 8, 2012. At the March 8 meeting, the Board again received public comments on R&J's application and visited the site. Many of the public comments related to traffic safety concerns regarding the use of Highway 88 as a haul route. During the March 8 meeting, R&J clarified it expected 126 trucks to leave the site each day, instead of eighty. At the end of the meeting, the Board voted 2–1 to deny R&J's application.

¶ 4. The Board issued a written decision denying R&J's application on March 29, 2012. The decision addressed each of the seven factors the Buffalo County Zoning Code requires the Board to consider when deciding whether to grant a CUP. The only reason the Board identified for denying the application was its concern that the large number of trucks leaving the mine site each day would decrease traffic safety on Highway 88. The Board observed, "At 126 loads out of product and 126 unloaded trucks returning, 252 total trucks would be on the road in a given day. This equates to one truck passing a single designated point each 3.33 minutes through out [sic] the day (14 hour hauling period)." The Board expressed concern that, "[d]ue to the extreme weight of the semi trucks and trailers, the reaction time to slow down, not to mention stopping at [the] driveways/intersections [on Highway 88], could be compromised." The Board also highlighted anecdotal evidence that vehicles sometimes cross the centerline of Highway 88, "due in part to the current road layout and the severity of the corners."

¶ 5. R&J did not seek circuit court review of the Board's decision. Instead, on March 27, 2012, R&J submitted a second CUP application. The second application was identical to the first, except that it corrected a misspelled word, changed the proposed number of

trucks leaving the site from eighty per day to 126, and proposed to have trucks hauling six days per week instead of five.

¶ 6. The Board held a public hearing on R&J's second CUP application on April 19, 2012. During the hearing, the Board once again received public comments and visited the proposed mine site. Members of the public again expressed concerns about increased traffic on Highway 88. At the end of the hearing, the Board voted to table R&J's second application for sixty days while the Wisconsin Department of Transportation (DOT) conducted a Traffic Safety Impact Assessment.

¶ 7. At a subsequent hearing on June 14, 2012, DOT representative Tom Beekman presented the DOT's initial findings. Beekman explained the DOT had analyzed a thirty-mile segment of Highway 88. Aside from a 1.4–mile segment near Laehn Ridge Road and another segment "in the urban area of Gilmanton[,]" the DOT concluded "the other 28 miles [are] at or below the state-wide average crash rate, which says performing as expected from a safety standpoint. This is not an abnormal unsafe road." Beekman also explained that, while the relevant portion of Highway 88 contains twenty curves that cause concern with respect to trucks encroaching on the center line, sixty percent of those curves are located near Laehn Ridge Road. Beekman stated the rest of Highway 88 "operates at a fairly reasonable level from a geometric standpoint." He concluded:

> I guess if people are hoping that the [DOT is] going to have an absolute data [sic] that says this road is absolutely safe or this one is absolutely unsafe, it's not going to happen. That's not a statement we make on any road. We talk about probability. We talk about

ranges. We continue to feel that within the context of this permit, the number of trucks being identified out of this permit, that we do not see Highway 88 moving into any different statistical range for crashes or safety. . . . We do not believe it moves into a different statistical range of safety issues at this point in time.

At the end of the June 14 hearing, the Board voted to table R&J's second CUP application to give the Board a chance to review the DOT's report in greater detail.

¶ 8. At a subsequent hearing on June 27, 2012, Beekman provided additional information about lane encroachments on Highway 88. He explained a computer simulation showed that eighty percent of lane encroachments on the relevant section of Highway 88 occurred in the Laehn Ridge Road area. He also stated, "[T]he maximum encroachments we were looking at were basically, on 80% of them that did pop up were 0 to 2 feet, which is very, very minimal at the low end."

¶ 9. At the end of the June 27 hearing, the Board granted R&J's second CUP application, subject to forty-three conditions. The Board's written decision, which was issued July 5, 2012, was similar to its earlier decision denying R&J's first CUP application. As in the previous decision, the Board acknowledged members of the public had expressed concern that the high volume of trucks associated with the mine would decrease traffic safety on Highway 88. However, the Board explained:

> The Wisconsin DOT Northwest Region contracted with AECOM to conduct a "Traffic Safety Impact Assessment" for [Highway 88] during May and June of 2012 in light of the potential increase in truck volume on [Highway 88] from proposed, new non-metallic mine operations in the area. Representatives of the DOT were present at the hearings/meetings to present the

initial as well as updated results of their assessment and answer questions. Specifically, AECOM addressed crashes and crash rates as well as geometric and operational features pertaining to [Highway 88]. Overall, the [DOT] acknowledges that [Highway 88] may have some substandard features, but believes the road can handle increased traffic volumes.

The CUP limited the number of truck loads leaving the site to 105 per day and prohibited hauling on weekends and certain holidays.

¶ 10. O'Connor, one of the citizens who opposed R&J's application due to traffic safety concerns, subsequently sought certiorari review of the Board's decision to grant the CUP. *See* Wis. Stat. § 59.694(10) (allowing "[a] person aggrieved by any decision of the board of adjustment" to "commence an action seeking the remedy available by certiorari" within thirty days of the board's decision).[2] On the same day, the School District of Cochrane-Fountain City filed a separate certiorari action. Glacier Sands successfully moved to intervene in both lawsuits, which were then consolidated on April 18, 2013. The circuit court ultimately affirmed the Board's decision to grant the CUP, and O'Connor now appeals.

## DISCUSSION

¶ 11. On certiorari review, we review the Board's decision, not the circuit court's. *Roberts v. Manitowoc Cnty. Bd. of Adjust.*, 2006 WI App 169, ¶ 10, 295 Wis. 2d 522, 721 N.W.2d 499. Our review is limited to the following four factors: (1) whether the Board kept

---

[2] All references to the Wisconsin Statutes are to the 2011–12 version unless otherwise noted.

within its jurisdiction; (2) whether it proceeded on a correct theory of law; (3) whether its action was arbitrary, oppressive, or unreasonable and represented its will and not its judgment; and (4) whether the evidence was such that the Board could reasonably reach the determination under review. *Id.*, ¶ 11. The Board's decision is entitled to a presumption of correctness, and O'Connor has the burden to overcome that presumption. *See id.*, ¶ 10.

¶ 12.　O'Connor argues the Board proceeded on an incorrect theory of law by granting the CUP for two reasons:　(1) the Buffalo County zoning ordinance does not allow frac sand mining as a conditional use in the agricultural district; and (2) after the Board denied R&J's first CUP application, it was prohibited from considering the merits of R&J's second application. O'Connor also argues the Board "acted arbitrarily, unreasonably, and outside its jurisdiction by granting a CUP with no information . . . about the identity of R&J's partners." We address and reject these arguments in turn.

## I. Interpretation of the Buffalo County zoning ordinance

¶ 13.　O'Connor first argues the Board proceeded on an incorrect theory of law because the plain language of the Buffalo County zoning ordinance does not allow frac sand mining as a conditional use on land that is zoned agricultural. Interpretation of an ordinance presents a question of law that we review independently. *State v. Ozaukee Cnty. Bd. of Adjust.*, 152 Wis. 2d 552, 559, 449 N.W.2d 47 (Ct. App. 1989). However, on certiorari review, we defer to the Board's interpretation

of its own ordinance as long as it is reasonable. *See Ottman v. Town of Primrose*, 2011 WI 18, ¶ 60, 332 Wis. 2d 3, 796 N.W.2d 411. The Board's interpretation is unreasonable if it is contrary to law; if it is clearly contrary to the intent, history, or purpose of the ordinance; if it is without a rational basis; or if it directly contravenes the words of the ordinance. *Id.*, ¶ 62.

¶ 14. Section 41(1) of the applicable version of Buffalo County's zoning ordinance lists the following as a "conditional use" on property that is zoned agricultural:

> Manufacturing and processing of natural mineral resources indigenous to Buffalo County incidental to the extraction of sand and gravel and the quarrying of limestone and other rock for aggregate purposes, including the erection of buildings, and the installation of necessary machinery and equipment incidental thereto, but not the storage of cement, asphalt, or road oils or the mixing of concrete or black top or related materials, provided that any county, town, or municipal government or its agent may store or mix such materials when incidental to the improvement of highways or streets.[3]

---

[3] The parties cite to excerpts from an undated version of Buffalo County's zoning ordinance found in the appendices to O'Connor's and Glacier Sands' appellate briefs. These excerpts differ from the version of the ordinance available on Buffalo County's website, which was apparently updated in April 2013. *See* http://www.buffalocounty.com/BuffaloCountyOrdinances. htm. For instance, the version of the ordinance available online simply lists "nonmetallic mining" as a conditional use in the agricultural district, and it specifically defines "nonmetallic mining" to include "industrial sand mining." BUFFALO CNTY., WIS., ZONING ORDINANCE §§ 30(f), 51(1) (Apr. 2013), *available at* http://www.buffalocounty.com/Ordinance/ZoningOrdinanceapproved%204%2016%202013.pdf. Because the version of the ordinance available online was

O'Connor argues the phrase "for aggregate purposes" modifies the entire first clause of this paragraph. He therefore argues § 41(1) "allows for 'manufacturing and processing . . . incidental to the extraction of sand' only when it is 'for aggregate purposes'—meaning use in cement, asphalt, or similar materials." Because frac sand mines do not extract sand for aggregate purposes, O'Connor asserts they are not a conditional use under § 41(1).

¶ 15. In contrast, the Board argues the phrase "for aggregate purposes" modifies only the term immediately preceding it—that is, "the quarrying of limestone and other rock[.]" The Board therefore argues § 41(1) permits two distinct types of conditional uses: (1) manufacturing and processing of natural mineral resources indigenous to Buffalo County incidental to the extraction of sand and gravel; and (2) the quarrying of limestone and rock for other aggregate purposes. The Board contends frac sand mines fall within the first type of conditional use permitted by § 41(1).

¶ 16. We conclude both O'Connor and the Board have advanced reasonable interpretations of § 41(1). From the text of the ordinance alone, it is unclear whether the phrase "for aggregate purposes" modifies the entire preceding clause or only the words "the quarrying of limestone and other rock[.]" Because the Board has advanced a reasonable interpretation of the ordinance's text, we must defer to the Board's interpretation. *See Ottman*, 332 Wis. 2d 3, ¶ 60.

¶ 17. O'Connor argues the Board's interpretation is not reasonable because § 41(1) is "replete with words indicating that it exists to allow for the preparation of

updated after R&J filed its second CUP application, we rely on the excerpts provided in the parties' appendices.

materials ('aggregate') needed for local road and construction work[.]" O'Connor therefore asserts it is "absurd to argue . . . that the 'for aggregate purposes' language would modify only 'limestone and other rock' and would place no limitation at all on 'sand and gravel'—two items essential to road materials." We disagree. As the Board points out, § 41(1) is replete with words concerning road construction because it explicitly lists an additional use associated with mining and quarrying that relates to road construction but is *not* permitted—that is, "the storage of cement, asphalt, or road oils or the mixing of concrete or black top or related materials" by private parties. That § 41(1) prohibits one use related to road construction does not compel a conclusion that other uses permitted by the section must also relate to road construction.

¶ 18. O'Connor also argues the Board's interpretation is unreasonable because a large-scale, industrial frac sand mine is not consistent with the other conditional uses permitted by § 41(1), which include aircraft landing fields, drive-in theaters, kennels, mobile home parks, sawmills, landfills, agricultural supply businesses, timber yards, mini-storage facilities, and "municipal buildings for the purpose of repair or storage of road building or maintenance machinery." Again, we disagree. While O'Connor baldly asserts frac sand mining is inconsistent with these other conditional uses, he largely fails to explain why that is the case. The only inconsistency he specifically identifies is the fact that, pursuant to the CUP, this particular mine will generate a traffic volume of 105 trucks per weekday, which he asserts is "virtually unimaginable for any of the other permitted or conditional uses in the Agricultural District." O'Connor does not, however, point to any evidence in the record regarding the amount of traffic

generated by other conditional uses like sawmills, landfills, and timber yards. Given this lack of evidence, we cannot say frac sand mining is so inconsistent with the other conditional uses permitted by § 41(1) as to render the Board's interpretation of the ordinance unreasonable.

¶ 19. Moreover, evidence in the record shows the Board has historically interpreted § 41(1) to allow frac sand mining as a conditional use in the agricultural district. The Board has granted at least two other conditional use permits for frac sand mines on land that is zoned agricultural. In addition, Buffalo County's form for CUP applications specifically states the review fee for a CUP associated with a frac sand mine is $3,500, while the review fee for all other CUPs is $250. We agree with the Board that this evidence strongly suggests the Board's interpretation of § 41(1) is consistent with the intent, history, and purpose of the ordinance. *See Ottman*, 332 Wis. 2d 3, ¶ 62. O'Connor has failed to show that the Board's interpretation is unreasonable, and we therefore reject his argument that the Board proceeded on an incorrect theory of law.

## II. Consideration of R&J's second CUP application

¶ 20. O'Connor next argues the Board proceeded on an incorrect theory of law by considering the merits of R&J's second CUP application. He asserts that, after the Board denied R&J's first application, R&J's "sole remedy . . . was to commence a certiorari action in the circuit court." In support of his argument, O'Connor cites *Jefferson County v. Timmel*, 261 Wis. 39, 63–64, 51 N.W.2d 518 (1952), which states:

[I]f a zoning ordinance provides for an appeal to a Board of Adjustment . . . from an adverse ruling of an administrative officer . . . and court review of the decision or order of the Board of Adjustment is specifically provided for by statute, such remedy is exclusive of all other remedies and must be exhausted before a party can resort to the courts for other relief.

¶ 21. O'Connor is correct that, if R&J wished to challenge the Board's denial of its first CUP application, it would have been required to seek certiorari review as prescribed in WIS. STAT. § 59.694(10). However, nothing in § 59.694(10) prevented R&J from instead filing a second CUP application. O'Connor does not cite any statute, ordinance, or case that prevents a board of review from considering a second CUP application after it has denied a previous application by the same party. A municipality *may* enact a rule prohibiting a party whose application to the zoning board has been denied from filing a new application absent a substantial change in circumstances, *see Tateoka v. City of Waukesha Bd. of Zoning Appeals*, 220 Wis. 2d 656, 661, 672, 583 N.W.2d 871 (Ct. App. 1998), but Buffalo County has not done so. Given the lack of authority supporting O'Connor's position, we agree with the Board that an individual is free to submit a second CUP application after the first has been denied, as long as he or she is willing to pay a second application fee.

¶ 22. O'Connor argues this conclusion produces an absurd result because it allows a CUP applicant to "continue to get bite after bite at the apple—*de novo*—until receiving a favorable decision[,]" while members of the public opposing the CUP must then challenge it via certiorari, which is subject to a heightened standard of

246

review. He contends this places an unfair burden on those opposing the CUP and creates an uneven playing field. We disagree. Filing successive applications clearly places a significant burden on the CUP applicant, as well as those opposing the CUP. For each additional application, the applicant must pay an additional review fee. The applicant must spend time preparing a new application and appearing at new hearings before the board of adjustment. If the board ultimately grants a successive application, the applicant then faces the prospect that opponents will file an action for certiorari review, in which the applicant will likely choose to participate to defend the CUP. We therefore reject O'Connor's argument opponents of a CUP are unfairly or unequally burdened if a board is allowed to consider successive applications.

¶ 23. As an alternative basis for his argument that the Board should not have considered the merits of R&J's second CUP application, O'Connor relies on the doctrine of claim preclusion. The application of claim preclusion to a set of facts presents a question of law that we review independently. *See Lindas v. Cady*, 183 Wis. 2d 547, 552, 515 N.W.2d 458 (1994). "Claim preclusion provides that a 'final judgment on the merits in one action bars parties from relitigating any claim that arises out of the same relevant facts, transactions, or occurrences.'" *Barber v. Weber*, 2006 WI App 88, ¶ 9, 292 Wis. 2d 426, 715 N.W.2d 683 (quoting *Kruckenberg v. Harvey*, 2005 WI 43, ¶ 19, 279 Wis. 2d 520, 694 N.W.2d 879). "The doctrine has three elements: (1) identity between the parties or their privies in the prior and present suits, (2) prior litigation that resulted in a final judgment on the merits by a court with jurisdiction, and (3) identity of the causes of action in the two suits." *Id.*

¶ 24. O'Connor argues it is undisputed that the first and third elements of claim preclusion are satisfied, and the only disputed issue is whether the Board's decision denying the first application constituted "prior litigation that resulted in a final judgment on the merits by a court with jurisdiction[.]" *See id.* He correctly observes that, "[u]nder certain circumstances, Wisconsin recognizes unreviewed agency decisions as final judgments for purposes of claim preclusion." *Id.*, ¶ 11. Specifically, the agency's unreviewed decision may be given preclusive effect when the agency was "acting in a judicial capacity and resolve[d] disputed issues of fact properly before it which the parties . . . had an adequate opportunity to litigate[.]" *Id.* (quoting *Acharya v. AFSCME, Council 24*, 146 Wis. 2d 693, 697, 432 N.W.2d 140 (Ct. App. 1988)).

¶ 25. O'Connor acknowledges no Wisconsin court has addressed whether a board of adjustment is acting in a judicial capacity when it considers a CUP application. However, he notes the supreme court has held that a board of adjustment acts "in a quasi-judicial capacity" when considering an application for a variance. *State v. Kenosha Cnty. Bd. of Adjust.*, 218 Wis. 2d 396, 415, 577 N.W.2d 813 (1998), *abrogated on other grounds by State ex rel. Ziervogel v. Washington County Bd. of Adjust.*, 2004 WI 23, ¶¶ 3–8, 269 Wis. 2d 549, 676 N.W.2d 401; *see also State v. Outagamie Cnty. Bd. of Adjust.*, 2001 WI 78, ¶ 41, 244 Wis. 2d 613, 628 N.W.2d 376 (boards of adjustment have "broad quasi-judicial authority to grant variances for minor deviations from zoning restrictions"). O'Connor argues there is no valid reason the decision to grant a variance should be considered a judicial act but the decision to grant a CUP should not.

¶ 26. The problem with O'Connor's argument is that, even assuming the Board was acting in a judicial capacity when it denied R&J's first CUP application, there is no law supporting O'Connor's assertion that claim preclusion barred *the Board* from accepting the second application. All of the cases O'Connor cites address whether an unreviewed agency decision can preclude *a court* from later considering related claims. *See, e.g., Lindas,* 183 Wis. 2d at 549–50 (personnel commission's unreviewed decision that plaintiff was not fired due to sex discrimination precluded her from challenging the termination in a subsequent action under 42 U.S.C. § 1983); *Barber,* 292 Wis. 2d 426, ¶¶ 1–4, 20 (zoning board's unreviewed decision that defendants' use of their property was lawful precluded plaintiffs' subsequent lawsuit asking the circuit court to declare the use unlawful). Rather than asserting the Board's denial of R&J's first CUP application precluded further litigation *in court,* O'Connor argues *the Board itself* was precluded from accepting R&J's second application. O'Connor does not cite, and our research has not revealed, any Wisconsin case holding that an agency's unreviewed denial of an application precludes the agency from considering a subsequent application submitted by the same party.

¶ 27. The existence of local rules prohibiting successive applications supports our conclusion that claim preclusion did not bar the Board from considering R&J's second CUP application. As noted above, some municipalities have enacted rules prohibiting a party whose application to a zoning board has been denied from filing a new application absent a substantial change in circumstances. *See Tateoka,* 220 Wis. 2d at 661. If claim preclusion operated to bar zoning boards

from considering successive applications, there would be no need for these successive application rules.

¶ 28. In addition, even if O'Connor were correct that the doctrine of claim preclusion generally bars agencies from considering successive applications, we agree with the Board and Glacier Sands that O'Connor has not shown claim preclusion applies under the specific facts of this case. O'Connor concedes claim preclusion "would not operate to permanently bar another application for a CUP; it would only continue to do so as long as the pertinent facts remained substantially the same." Here, the evidence regarding traffic safety—which was the Board's sole reason for denying R&J's first application—was significantly different during the Board's consideration of the second application.

¶ 29. In its decision denying R&J's first CUP application, the Board relied on anecdotal evidence to conclude the proposed mine would decrease traffic safety on Highway 88. In contrast, during the April 19, 2012 hearing on R&J's second CUP application, DOT representative Beekman informed the Board the DOT had concluded the relevant portion of Highway 88 was generally "at or below the state-wide average crash rate" and was "performing as expected from a safety standpoint." After presenting the DOT's findings, Beekman stated the DOT did not believe the proposed mine would "move[] [Highway 88] into a different statistical range of safety issues[.]" Beekman presented the Board with "pertinent facts" regarding traffic safety on Highway 88, which were not "substantially the same" as the facts presented during proceedings on R&J's first CUP application. Thus, under O'Connor's own reasoning, claim preclusion did not bar the second application.

250

## III. Failure to ascertain the identities of R&J's partners

¶ 30. Finally, O'Connor argues the Board acted "arbitrarily, unreasonably, and outside its jurisdiction" by granting the CUP when there was "no information given or available about the identity of R&J's partners." O'Connor notes that WIS. STAT. § 801.11(6), which governs service of process on partners and partnerships, states a summons "shall be served individually upon each general partner known to the plaintiff[.]" He then observes that neither of R&J's CUP applications disclosed the identities of R&J's partners. He also notes R&J is not registered with the Wisconsin Department of Financial Institutions. Due to this lack of information about R&J's partners, O'Connor argues Buffalo County may not be able to serve R&J, and, consequently, it "may prove impossible to enforce important conditions of the CUP[.]"

██ ██

¶ 31. We reject O'Connor's argument for three reasons. First, O'Connor does not cite any legal authority for the proposition that a board of adjustment may not grant a CUP to a partnership without first ascertaining the partners' identities. Second, O'Connor does not cite any evidence that he, or anyone else, raised concerns regarding the lack of information about R&J's partners during the Board's consideration of either CUP application. Third, although O'Connor asserts it "may prove impossible" to enforce the CUP's conditions, the Board argues Buffalo County's zoning ordinance provides several enforcement mechanisms that do not require service of process, including the right to inspect the premises to ensure compliance and the right to investigate complaints. In addition, Glacier Sands notes

that one of the CUP's conditions allows the county to revoke the CUP for noncompliance. O'Connor does not respond to these arguments that other adequate enforcement mechanisms exist, and unrefuted arguments are deemed conceded. *See Charolais Breeding Ranches, Ltd. v. FPC Secs. Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979). O'Connor has not met his burden to overcome the presumption of correctness by showing the Board acted arbitrarily, unreasonably, or outside its jurisdiction.

*By the Court.*—Order affirmed.